[Cite as *In re E.W.*, 2024-Ohio-235.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: E.W.
    A.W.
    J.W.

C.A. Nos.    30802
               30803
               30816

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 21 06 450
               DN 21 06 451
               DN 21 06 452

DECISION AND JOURNAL ENTRY

Dated: January 24, 2024

SUTTON, Presiding Judge.

{¶1} Appellant, B.W. ("Father"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated his parental rights and placed three of his minor children in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

{¶2} Father is the biological father of A.W., born March 30, 2015; and J.W., born April 9, 2016. He is also alleged to be the father of E.W., born April 6, 2020, but his paternity has not been formally established. Therefore, pleadings pertaining to E.W. were also served on an unidentified "John Doe" father throughout this case. Because CSB has not challenged Father's standing to appeal the permanent custody judgment of E.W., and for ease of review, this Court

will address Father's challenges to the permanent custody judgments pertaining to all three children. The children's mother ("Mother") had minimal involvement in the trial court proceedings and did not appeal the trial court's permanent custody judgment.

{¶3} When this case began, the children were residing with Mother. Although Mother and Father were involved in a long-term relationship and had lived together with the children, it is unclear whether Father was living in the home at that time. On June 9, 2021, the children were removed from the home pursuant to Juv.R. 6. The following day, CSB filed complaints to allege that each child was abused, neglected, and dependent because of a history of failing to meet the children's basic needs, substance abuse and domestic violence in the home, Father's arrest on charges of violating a protection order against Mother and the children, and Mother's hospitalization following an apparent incident of domestic violence. Father later entered a guilty plea to attempted violation of a protection order and was placed on probation. Among other things, Father was required by the conditions of his probation to abstain from using drugs and alcohol.

{¶4} The parents waived their rights to a contested hearing and the children were adjudicated dependent by agreement of the parties. Shortly afterward, the trial court placed the children in the temporary custody of CSB, adopted the case plan as an order of the court, and ordered Father to complete the Stop the Cycle domestic violence prevention program at the Battered Women's Shelter. After the protection order against Father expired, CSB amended the case plan to add more specific requirements for him to address the history of domestic violence and substance abuse in his relationship with Mother and the children. No party filed objections, so the trial court adopted the amended case plan.

{¶5} During the first year of the case, CSB believed that Father was making progress on the case plan because he was engaging in substance abuse and domestic violence counseling

programs. Upon CSB's motions, the trial court granted two six-month extensions of temporary custody. At the time it requested each extension, CSB supported reunification between Father and the children but believed that Father needed more time to prepare his home for the children and to demonstrate that he had achieved and maintained sobriety. CSB was then unaware, however, that Father had not informed his substance abuse counselors that he had a drinking problem. Instead, he had been engaging in substance abuse treatment solely for his admitted use of marijuana.

{¶6} While under the mistaken impression that Father had been addressing his drinking problem, CSB gradually expanded his visits with the children and eventually permitted him to have unsupervised visits in his home. The caseworker came to a visit during February 2023, and believed that Father was under the influence of alcohol because he was slurring his words, and his eyes were glassy. When she asked Father if he had been drinking, he admitted that he had consumed alcohol at lunch before the visit because it was his birthday. The caseworker terminated the visit and removed the children from Father's home.

{¶7} After that visit, the caseworker learned from the older children that they had often witnessed Father drinking during visits and that J.W. had once found a bag of marijuana under a bed in Father's home. J.W. told her that she moved the marijuana, so it was no longer accessible by her younger brother, E.W. Consequently, CSB filed an amended case plan, which was adopted by the trial court because no one filed objections. Father's visitation with the children was changed from unsupervised to supervised and the amended case plan further emphasized that Father was prohibited from being around his children while under the influence of alcohol or drugs. After CSB amended the case plan, Father did not contact CSB for approximately six weeks to schedule visitation with his children.

{¶8} At about the same time, the older children obtained mental health assessments and began trauma-based counseling. A.W. and J.W. each reported to their counselor, the caseworker, and the guardian ad litem that they had witnessed domestic violence between Mother and Father and that they had also been the victims of Father's violence. They described incidents such as Father slamming Mother into a door and banging their heads against the wall as a form of discipline. They also reported seeing Father drinking excessive amounts of alcohol and becoming violent when he was drinking.

{¶9} Their counselor, who assessed and counseled each child individually, diagnosed both A.W. and J.W. with other specified trauma and stressor-related disorder due to their exposure to trauma while living with Father and Mother. Each child began engaging in weekly counseling to address their past traumas, to develop better coping skills to manage their anger and disruptive behaviors, and to learn to build and maintain positive personal relationships.

{¶10} On March 9, 2023, CSB moved for permanent custody of the three children. Father alternately moved for the children to be placed in his legal custody. Following a final dispositional hearing, the trial court terminated parental rights and placed E.W., A.W., and J.W. in the permanent custody of CSB. Father appeals and raises one assignment of error.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR IN FINDING THAT IT WAS IN THE CHILDREN'S BEST INTEREST TO BE PLACED IN THE PERMANENT CUSTODY OF [CSB]. THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶11} Father's sole assignment of error is that the trial court's permanent custody decision was not supported by the evidence presented at the final dispositional hearing. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving

agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶12} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶13} The trial court found that the first prong of the permanent custody test was satisfied because E.W., A.W., and J.W. had been in the temporary custody of CSB for at least 12 months of a consecutive 22-month period under R.C. 2151.414(B)(1)(d). Father does not dispute that finding, which is supported by the record. The children were considered to have entered the temporary custody of CSB on August 8, 2021 (sixty days after they were removed from the home,

which was two days before the adjudicatory decision was filed) and CSB filed its motion for permanent custody on March 9, 2023. *See* R.C. 2151.414(B)(1). Consequently, at the time CSB moved for permanent custody, the children had been in its temporary custody for 19 months of a consecutive 22-month period.

{¶14} On appeal, Father challenges the trial court's finding that permanent custody was in the best interest of the children. His primary argument is that he complied with the reunification goals of the case plan. This Court has repeatedly held that, although case plan compliance may be relevant to the children's best interest, it is not determinative. *In re K.C.*, 9th Dist. Summit Nos. 30234 and 30237, 2022-Ohio-2851, ¶ 17, citing *In re J.W.*, 9th Dist. Summit No. 28976, 2019-Ohio-210, ¶ 15. Furthermore, the evidence in the record demonstrated that Father did not make significant progress on the goals of the case plan.

{¶15} The case plan identified two key problems that Father was required to address: his history of domestic violence in the home and his related substance abuse, particularly his excessive consumption of alcohol. Regarding his history of domestic violence, CSB presented the testimony of several witnesses that the children had told them that Father had been violent with Mother and them, particularly when he consumed alcohol. The caseworker testified that Mother once came to visit the children with visible bruises that she said were caused by Father.

{¶16} The caseworker also expressed concern that Father had completed the Stop the Cycle domestic violence program, yet he continued to downplay the significance of that problem in his family. More significantly, when Father testified at the hearing, he vehemently denied that he had ever been violent with Mother or the children. He testified that the children had lied if they stated otherwise.

**{¶17}** Father apparently overlooked the significance of the facts that had already been established on the record. The agency explicitly alleged that Father had a history of perpetrating domestic violence against Mother as a basis for its complaints that the children were dependent. Father had the opportunity to contest those allegations at an adjudicatory hearing, but he chose to waive that right, in consultation with his trial counsel. *See In re I.R.*, 9th Dist. Summit Nos. 30500, 30501, 30502, 30529, 30530, and 30531, 2023-Ohio-3044, ¶ 25. Had Father exercised his right to a contested adjudicatory hearing, CSB would have been required to prove its allegations by clear and convincing evidence. *Id*. Instead, Father agreed to the children being adjudicated dependent based, in part, on a history of domestic violence in the family. Father's insistence two years later that domestic violence had never been a problem in his family only supported the trial court's conclusion that he had not resolved that problem.

**{¶18}** Father's excessive consumption of alcohol was also alleged in the complaints and formed a basis of the agreed dependency adjudication of the children. Although Father engaged in substance abuse counseling throughout this case, it was not until March 2023, after CSB moved for permanent custody, that Father began to address his alcohol problem. According to the testimony of Father's substance abuse counselors, Father engaged in intensive outpatient treatment and an aftercare program, but the only substance use he disclosed prior to March 2023 was marijuana. Consequently, Father's counseling throughout most of this case did not focus on his overuse of alcohol.

**{¶19}** Several witnesses testified about repeatedly seeing Father under the influence of alcohol during this case. They described why they concluded Father had been drinking, such as observing him slurring his speech and smelling alcohol on his breath. One of Father's substance abuse counselors testified that during one group session, Father was almost falling asleep; he made

little sense or kept repeating himself when he spoke; and other members of the group rolled their eyes when Father spoke because they, too, apparently believed that Father was intoxicated.

{¶20} After the caseworker confronted Father at the February 2023 visit and cancelled his unsupervised visit because he admitted he had consumed alcohol, Father tried to stop drinking on his own. As a result, he began suffering seizures and had to be hospitalized. Father later admitted that the seizures were the result of his attempt to stop drinking, but he minimized the significance of his problem and insisted that he drank only a few times a week. The trial court heard contradictory testimony, however, that Father would not have suffered such severe withdrawal symptoms from moderate alcohol consumption.

{¶21} It was not until after his seizures and hospitalization that Father disclosed to his substance abuse counselors that he had an alcohol problem. One of the counselors reassessed him and diagnosed Father with severe alcohol use disorder. The counselor recommended residential treatment because Father needed a higher level of care than intensive outpatient treatment. Father stated that he could not engage in residential treatment because he needed to work to pay his bills. Father was collecting unemployment compensation at the time.

{¶22} Moreover, Father insisted that he could resolve his drinking problem without residential treatment, but he did not. Several witnesses continued to observe Father under the influence of alcohol, which was a violation of the case plan and the conditions of his probation. Each of his counselors testified that Father sporadically engaged in treatment and that he continued to come to sessions under the influence. One counselor testified that Father had attended a session while intoxicated as recently as one week before the hearing.

{¶23} The caseworker testified that she had repeatedly believed that Father had been drinking when she saw him during recent months, but he refused to submit to most of her requests

for a urine sample or oral mouth swab. Father did submit to one recent substance abuse screen, which tested positive for alcohol. Father admitted that he had consumed two glasses of wine on Father's Day, which had been two days before the test. Aside from concerns that any alcohol consumption demonstrated that Father had not achieved sobriety, one of his counselors testified that it would not be possible for Father to test positive if his only alcohol consumption had been two days earlier. His counselors believed that Father was still regularly drinking alcohol and denying that he had a problem.

{¶24} At the hearing, Father admitted that he had suffered severe withdrawal symptoms when he tried to stop drinking during March 2023, and that he had tested positive for alcohol recently, yet he insisted that he no longer had an alcohol problem. The trial court did not believe his testimony, however, and concluded that Father had a severe alcohol problem that he had failed to resolve. The trial court had ample evidence before it to support that conclusion.

{¶25} When reviewing the trial court's determination that permanent custody was in the best interest of E.W., A.W. and J.W., this Court focuses primarily on the best interest factors set forth in R.C. 2151.414(D). *In re M.S.*, 9th Dist. Summit Nos. 30506 and 30515, 2023-Ohio-1558, ¶ 25. In making its best interest determination, the trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the children, their wishes, the custodial history of the children, their need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply.[1] R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11.

---

[1] CSB did not allege, and the trial court did not find, that any of those provisions applied to the facts of this case.

{¶26} Father's interaction with the children during this case was limited to weekly, two-hour visits. No one disputed that Father and the children were bonded, but Father would often sneak alcohol before or during visits and deny that he had been drinking when confronted about it. Given that his alcohol consumption impaired his judgment and had been linked to his past violent outbursts, it was not safe for the children to spend unsupervised time with Father because he had not achieved sobriety.

{¶27} The wishes of the children were expressed by the guardian ad litem. A.W. and J.W., then ages seven and eight years old, had told her and the caseworker that they wanted to stay with the foster family. E.W., who was only three years old at the time of the hearing, was too young to express his wishes. The guardian ad litem opined that permanent custody was in the best interest of all three children because Father had not recognized the significance of his parenting problems and he continued to abuse alcohol, despite insisting that he had achieved sobriety.

{¶28} Before this case began, the children lived with their parents, where they were exposed to ongoing substance abuse and domestic violence and their basic needs were not met. When the children were removed from the home, they were severely underweight; the older children, then ages five and six years old, could not identify letters or numbers; and E.W., then 14 months old, did not know how to swallow solid food. The children's custodial history during this case had included two years in the temporary custody of CSB. During that period, they had lived in the same foster home and had become bonded with the entire family. In that stable environment, the children's basic needs were being met, and they were working to resolve their developmental delays and trauma-related disorders.

{¶29} These children need a legally secure permanent placement, but CSB had been unable to identify any relatives who were willing and able to provide them with a suitable

permanent home. The trial court reasonably concluded that a legally secure permanent placement would be achieved by placing them in the permanent custody of CSB.

**{¶30}** Father has failed to demonstrate that the trial court lost its way by concluding that permanent custody was in the children's best interest. *See Eastley* at ¶ 20. Father's assignment of error is overruled.

## III.

**{¶31}** The assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETTY SUTTON
FOR THE COURT

CARR, J.
HENSAL, J.
CONCUR.

APPEARANCES:

SHUBHRA AGARWAL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

LAURIE M. BOVEINGTON, Guardian ad Litem.