[Cite as *In re W.W.*, 2024-Ohio-807.]

STATE OF OHIO          )          IN THE COURT OF APPEALS
                       )ss:       NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT       )

IN RE: W.W.                       C.A. No.     30815


                                  APPEAL FROM JUDGMENT
                                  ENTERED IN THE
                                  COURT OF COMMON PLEAS
                                  COUNTY OF SUMMIT, OHIO
                                  CASE No.     DN 21 08 0693

DECISION AND JOURNAL ENTRY

Dated: March 6, 2024

HENSAL, Judge.

{¶1}     Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed her child in the legal custody of the child's maternal great uncle and aunt ("Uncle" and "Aunt").  This Court affirms.

I.

{¶2}     Mother is the biological mother of W.W., born March 1, 2021.  The child's father is serving two life sentences for multiple counts of rape and gross sexual imposition of three unrelated children.  Although he was represented by counsel, he did not pursue reunification in the case below and has not appealed.

{¶3}     Summit County Children Services Board ("CSB" or "the agency") began investigating the child's circumstances around her birth due to Mother's history of mental health issues and housing instability.  The agency discovered that Mother had difficulty understanding the child's basic needs.  Home visits indicated a cluttered, unsanitary, and unsafe environment,

with food, clothing, and trash piled on the floor; soiled diapers strewn about, dog feces and urine throughout the home, and an infestation of roaches. Most problematic, however, was that W.W. was not gaining weight. At CSB's suggestion, Mother brought the child to the hospital where medical professionals diagnosed her with a failure to thrive. Mother agreed to voluntarily work with the agency to remedy the home conditions and abide by a feeding schedule for the child.

{¶4} Despite the agency's intervention, W.W. continued to lose weight. At four months old, her eyes had sunken dramatically and she weighed only nine pounds. Mother was unable to maintain an appropriate feeding schedule for the child to facilitate her growth. Coupled with ongoing concerns regarding the unsanitary home conditions; Mother's mental health issues; and Mother's unwavering insistence that Father was innocent of any sex offenses against children, would be exonerated, and would be an appropriate caregiver for the child; CSB removed W.W. from Mother's home and filed a complaint alleging the child's neglect and dependency.

{¶5} After an adjudicatory hearing, the magistrate found the child dependent and dismissed the allegations of neglect. The magistrate further found that Mother did not recognize that her home conditions or the child's low weight were problematic. Mother did not file an objection to the magistrate's decision.

{¶6} After the initial dispositional hearing, the juvenile court placed W.W. in CSB's temporary custody and adopted the agency's case plan as an order. Mother's case plan objectives included a basic needs component, emphasizing the need to remedy the unsanitary conditions in the home; a mental health component, including the requirement to follow through on recommendations for intensive treatment and a parenting assessment; and an objective requiring Mother to educate herself regarding the behaviors of sexual offenders, their grooming techniques, and the risks of sexual abuse to children.

{¶7} After investigation and approval, CSB placed W.W. in the home of nonblood kin, whom Mother had identified. The juvenile court ordered that Mother would initially have weekly two-hour supervised visits with the child, but that she would graduate quickly to unsupervised, overnight, and then weekend visits to ensure that she was able to independently meet the child's needs. Within a couple of weeks, however, the agency moved to modify that order and limit Mother to supervised visits because she had not completed her parenting assessment and was not focusing on the child during visits. The trial court restricted Mother's visitation accordingly.

{¶8} After a review hearing two months later, the juvenile court again implemented a graduated plan to expand Mother's visitation. A month later, CSB again moved to limit Mother to supervised visits based on the recommendations of the assessor who conducted her parenting evaluation, as well as some concerning behaviors by Mother during visitation. The guardian ad litem agreed with restricting Mother to supervised visits for the time being. The juvenile court again rescinded its order for expanded visitation.

{¶9} Mother moved for legal custody, or alternatively, a six-month extension of temporary custody. CSB moved for legal custody to a third party, Ms. R., the nonblood kin with whom it had placed the child. At the sunset hearing, Mother withdrew her motions, waived her right to a contested hearing, and agreed to an award of legal custody of the child to Ms. R. Thirteen months into the case, the juvenile court granted legal custody to Ms. R. and closed the case.

{¶10} Three weeks later, CSB sought an emergency order of temporary custody and moved to modify Ms. R.'s legal custody of W.W. to temporary custody to the agency. In the three weeks since obtaining legal custody, Ms. R. had been diagnosed with a medical condition requiring extensive treatment that prevented her from continuing to provide care for the child. After a shelter

care hearing, the magistrate granted emergency temporary custody to CSB which placed the child with Uncle and Aunt, whom Mother had identified as potential caregivers.

{¶11} CSB filed an amended case plan, reiterating Mother's prior case plan objectives. The juvenile court adopted the amended case plan as an order. Thereafter, CSB moved for legal custody of the child to Uncle and Aunt. Mother moved for legal custody, or alternatively, a six-month extension of temporary custody. Five months after the agency invoked the juvenile court's continuing jurisdiction over W.W., the magistrate held a hearing on the parties' dispositional motions. The magistrate issued a decision denying Mother's motions, granting CSB's motion, and placing the child in the legal custody of Uncle and Aunt. Mother timely objected to the magistrate's decision. Both the agency and guardian ad litem responded in opposition.

{¶12} The juvenile court overruled Mother's objection. It denied Mother's motion for a six-month extension of temporary custody upon finding that Mother had not made significant progress on her case plan objectives and that an extension was not in the best interest of the child. The trial court granted CSB's motion for legal custody to Uncle and Aunt, leaving visitation as the parties might agree. Mother appealed, raising two assignments of error for review. As she consolidated her assignments of error for discussion, we do likewise to facilitate review.

II.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR IN DENYING MOTHER'S MOTION FOR LEGAL CUSTODY AND MOTION FOR SIX-MONTH EXTENSION OF TEMPORARY CUSTODY AND FINDING THAT IT WAS IN THE CHILD'S BEST INTEREST TO BE PLACED IN THE LEGAL CUSTODY OF RELATIVES.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND PLAIN ERROR IN GRANTING LEGAL CUSTODY OF W.W. TO RELATIVES AS

THE COURT'S DECISION WAS NOT SUPPORTED BY PREPONDERANCE OF THE EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶13}  Mother argues that the juvenile court erred by denying her alternative motions for legal custody or a six-month extension of temporary custody, and by granting CSB's motion for legal custody to Uncle and Aunt.  This Court disagrees.

{¶14}  Our standard of review for such challenges is well settled:

> On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence.  Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value.  In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest.

(Internal citations and quotations omitted.)  *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

{¶15}  In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered."  (Internal citations and quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.  When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact."  *Id.* at ¶ 21.

{¶16}  "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12.  The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal

custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. In that regard, the juvenile court is guided by the best interest factors enumerated in Revised Code Section 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17.

{¶17} The best interest factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in Section 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 16. In addition, the juvenile court may also look to the best interest factors in Section 3109.04(F)(1) for guidance. *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850 and 15CA010860, 2017-Ohio-1, ¶ 17. While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶18} W.W. was in Mother's legal custody briefly before CSB removed her when the infant was five months old. After spending more than a year in the agency's temporary custody, the child was placed in the legal custody Ms. R. for mere weeks before that custodial disposition disrupted. CSB resumed temporary custody of the child for over five additional months until the contested legal custody hearing. By that time, W.W. had spent three quarters of her life in custodial limbo and deserved stability and permanence.

{¶19}   Mother struggled with issues that prevented her from being able to provide a safe, secure, and stable environment for the child.  Her mental health diagnoses of depression, bipolar disorder, post-traumatic stress disorder, and borderline personality disorder made her quick to anger and impacted her ability to interact appropriately with others and make sound parenting decisions.  Despite her involvement with both Coleman and Ever Well Community Health, Mother demonstrated no improvements in insight or practical skills.  She continued to express her belief that Father was innocent of the sex crimes for which he was convicted and that he would be an appropriate caregiver for the child.  Mother also maintained a limited understanding regarding the child's needs and development.  For example, she failed to cut the child's food into appropriately sized pieces and once gave W.W. hard candy which caused her to choke, requiring intervention by Aunt when Mother failed to take appropriate action.

{¶20}   Aunt testified that other behaviors by Mother with the child caused her concern for W.W.'s safety.  For example, during a visit at a store, Mother put the child down so Mother could look at something that caught her attention.  When Aunt asked Mother where W.W. was, Mother did not know.  On other occasions during visits, Mother would frequently spend time looking at her phone or talking with the adults who were supervising the visits instead of focusing on the child.  While Uncle and Aunt expressed concern that Mother was easily distracted during visits, Mother testified that she thought the two-year-old child did not need constant oversight because that would allow the child to learn boundaries and develop independence.

{¶21}   Mother made limited improvements in maintaining a safe and clean home.  She had very few furnishings.  While the dog who had urinated and defecated throughout the home had died, Mother replaced him with four cats.  Because she had only one litterbox for the cats, Mother's

home continued to smell of pet waste. In addition, the guardian ad litem was concerned that Mother left the litterbox in an area accessible to the child.

{¶22} Throughout most of the case, Mother was engaged in services at Ever Well where a team of five people helped manage her care. A therapeutic behavioral specialist coordinated Mother's team and monitored her progress. A psychosocial rehabilitation specialist worked directly with Mother to help her develop interpersonal skills and manage daily activities. Together, they addressed issues like budgeting, setting goals, finding employment, and choosing appropriate activities for the child. Mother's community resource treatment specialist helped her access resources for food, clothing, furniture, hygiene products, and cleaning supplies, reaching out to Mother twice each month. Mother frequently contacted that specialist beyond those times for additional assistance. Mother's therapist provided counseling services, while her parenting instructor focused on information regarding child development and protection.

{¶23} Mother took advantage of Ever Well services necessary to meet her immediate basic needs. For example, Mother frequently ran out of money between paychecks for food and other necessities. While she was employed at the time of the hearing, she had only recently begun working for her current employer. Mother's employment history was sporadic. She moved from job to job and spent periods of time with no income. She did not have a car but reported that she planned to buy one with funds from her expected tax refund. After receiving that money, however, Mother took a trip in North Carolina instead.

{¶24} As for services geared towards stability and long-term needs, Mother's focus waned. She did not engage in counseling services on a regular basis. Her failure to meet regularly with her therapist hindered her ability to work through the trauma she endured throughout her childhood and gain insight into how to protect the child from predators. Mother further had only

recently begun attending parenting classes which would include lessons regarding how to identify sexual predators, grooming behaviors, and ways to keep a child safe from people who posed a threat. While she testified that she had researched the warning signs and dangers of predators, Mother refused to acknowledge the threat Father posed to W.W. Instead of recognizing the significance of Father's rape and gross sexual imposition convictions involving children, Mother testified that she could not say that Father was guilty because she was not there when the incidents occurred.

{¶25} While Mother and W.W. share a bond, Mother failed to take advantage of many of her opportunities for visitation. She missed nearly all her weekly Thursday visits and attended only 70 percent of her scheduled Saturday visits. Mother frequently did not notify Uncle and Aunt when she could not attend a visit. When she did notify them, she said she was busy or did not have transportation, despite Aunt's testimony that she offered to pick Mother up from the bus station nearby.

{¶26} The child is too young to express her desires regarding custody, so the guardian ad litem spoke on her behalf. The guardian ad litem recommended legal custody to Uncle and Aunt, given the child's comfort and familiarity in their home where all her basic needs were being met. Both the caseworker and guardian ad litem were concerned that Mother's lack of progress on her case plan objectives left her unable to provide a safe and stable home for the child then or within a reasonable time.

{¶27} Based on a thorough review of the record, this is not the exceptional case where the trier of fact clearly lost its way and created a manifest miscarriage of justice by awarding legal custody to Uncle and Aunt. The child was flourishing in their home. They facilitated opportunities for Mother to visit with W.W. during twice-weekly scheduled visits, as well as during frequent

family get-togethers and church events. W.W. was safe and secure in the home of Uncle and Aunt who met all her basic needs. Mother, on the other hand, struggled with meeting even her own basic needs, frequently running out of food and failing to maintain a sanitary home. She refused to recognize that Father was the type of person who posed a threat to the child's well-being. Under these circumstances, the juvenile court's finding that an award of legal custody to Uncle and Aunt was in the child's best interest is not against the manifest weight of the evidence.

{¶28} To the extent that Mother argues that the juvenile court erred by failing to grant her motion for a six-month extension of temporary custody, this Court disagrees.

{¶29} As stated above, the juvenile court must resolve a motion for legal custody solely in consideration of the best interest of the child. *In re K.H.*, 2016-Ohio-1330, at ¶ 12. It is well settled that "'[w]here the trial court finds that it is in the best interest of the child to be placed in legal custody as a permanent disposition, the trial court must necessarily deny any extension of temporary custody.'" *In re B.C.*, 2014-Ohio-2748, at ¶ 22, quoting *In re C.M.*, 9th Dist. Summit No. 24380, 2009-Ohio-943, ¶ 24. *See also In re A.P.*, 9th Dist. Summit No. 30056, 2022-Ohio-276, ¶9 ("[I]f legal custody to a nonparent is in the best interest of the child, an extension of temporary custody is not.").

{¶30} In addition, the juvenile court would have only had authority to grant a first six-month extension of temporary custody if it also found, by clear and convincing evidence, that "there has been significant progress on the case plan of the child, and there is reasonable cause to believe that the child will be reunified with one of the parents * * * within the period of extension." R.C. 2151.415(D)(1). As explained above, Mother failed to make significant progress on her case plan objectives. She had not addressed her mental health issues stemming from the trauma she experienced from long-term abuse and neglect as a child. She failed to demonstrate an

understanding of the child's developmental needs and abilities. She continued to deny that Father posed a threat to the child notwithstanding his convictions for multiple sexual crimes against minors. Mother was employed sporadically and struggled to meet her own basic needs, frequently running out of food. She failed to maintain her home in a safe and sanitary condition. Mother frequently missed visits with W.W. and did not prioritize interactions with the child when she did appear for visitation.

{¶31} Moreover, there was not reasonable cause to believe that W.W. would have been reunified with Mother within the period of extension. For more than 18 months, Mother was aware of the concerns underlying the child's removal from her home. Although she had access to multiple service providers who might have helped her address those concerns, she either failed to take advantage of those services or gained limited insight into remedying the concerns, instead merely addressing an immediate need that reoccurred with continuing frequency. Mother never demonstrated sufficient progress to move beyond the need for supervised visits. Accordingly, she failed to present clear and convincing evidence that reunification was reasonably likely to occur within another six months.

{¶32} For the above reasons, this Court concludes that the juvenile court did not err by denying Mother's motion for a six-month extension of temporary custody and granting CSB's motion for legal custody to Uncle and Aunt. Accordingly, Mother's first and second assignments of error are overruled.

### III.

{¶33} Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

STEVENSON, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

SHUBHRA AGARWAL, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

EDWARD SMITH, Attorney at Law, for Appellee.

PAUL GRANT, Attorney at Law, for Appellee.

LAURIE M. BOVEINGTON, Guardian ad Litem.