[Cite as *In re A.J.*, 2024-Ohio-6011.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: A.J.
    T.G.

C.A. Nos.    31128
                31129

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN-23-02-095
                DN-23-02-098

DECISION AND JOURNAL ENTRY

Dated: December 26, 2024

---

SUTTON, Presiding Judge.

{¶1}    Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed two of her children in the legal custody of third parties. This Court vacates the judgment appealed in case number 31128 relating to the child T.G., and affirms the judgment appealed in case number 31129 relating to the child A.J.

I.

{¶2}    Mother is the biological mother of four children. The two at issue in these appeals are A.J., born November 9, 2007; and T.G., born January 10, 2018. Her other two children are T.R. and M.M. who were 11 and eight years old, respectively, when Summit County Children Services Board ("CSB" or "the agency") initiated these cases in the juvenile court. This Court will discuss facts regarding T.R. and M.M. to the extent they are relevant to the cases involving A.J.

and T.G. Father L.S. is the biological father of A.J. He has not appealed the judgment regarding his child. T.G.'s biological father is deceased.

{¶3} Mother was the children's sole legal custodian prior to CSB's involvement. She left Ohio with the children to live at some point in North Carolina. Mother returned to live in Ohio with the four children in November 2022. Mother, A.J., and T.G. stayed with various friends as Mother could arrange those accommodations, while T.R. and M.M. stayed with their respective fathers.

{¶4} In February 2023, after both becoming aware that Mother had not enrolled any of the children in school since their return to Ohio and reviewing a video of Mother hitting A.J. repeatedly in front of the other children, CSB filed complaints alleging that the four children were dependent and neglected. In addition, the agency alleged that A.J. was an abused child. The complaints further raised concerns regarding Mother's mental health.

{¶5} The juvenile court adjudicated the children neglected and dependent, placed them in the temporary custody of CSB, and adopted the agency's case plan as an order. The case plan required Mother to obtain a mental health assessment and follow all recommendations, and to demonstrate the ability to meet the children's basic needs. The agency later amended the case plan to require Mother to obtain a parenting assessment and engage in any recommended services, including, but not limited to, anger management, parenting education, substance abuse programs and drug screens, and group counseling.

{¶6} CSB initially placed A.J. and T.G. together in the same kinship home but that placement disrupted when the caregiver allowed the girls to spend unsupervised time with Mother in contravention of the court's order. The agency then placed the girls in a foster home together,

but A.J. left with T.G. in the middle of the first night. After the U.S. Marshalls found the girls more than a day later, CSB placed them in separate kinship homes.

{¶7} About six months into the cases, Mother moved for legal custody of T.G. under the agency's protective supervision. The fathers of T.R. and M.M. moved for legal custody of each man's respective child. CSB did not file any dispositive motions at that time but supported the two fathers' motions. The juvenile court granted legal custody of T.R. and M.M. to their fathers, and denied Mother's motion for legal custody of T.G., maintaining that child in CSB's temporary custody. Mother appealed all three judgments. On February 8, 2024, this Court issued a journal entry dismissing Mother's appeal regarding T.G. for lack of a final appealable order. *In re T.G.*, No. 30966 (9th Dist.).

{¶8} In the meantime, CSB filed a motion for legal custody of T.G. to her paternal grandmother ("Grandmother"), and two months later, a motion for legal custody of A.J. to a third party, non-blood kin ("Godmother"). On January 26, 2024, while Mother's appeal regarding T.G. was still pending before this Court, the magistrate commenced an evidentiary hearing below on the agency's two final dispositional motions, hearing the testimony of three witnesses. The parties finished presenting evidence on February 16, 2024. Between the first and second days of the hearing, Mother filed a motion for a six-month extension of temporary custody regarding both children. Upon the objections of CSB and the guardian ad litem, the magistrate dismissed Mother's motion for an extension of temporary custody as having been untimely filed.

{¶9} After the conclusion of the hearing, the magistrate issued decisions granting CSB's motions for legal custody. By this time, this Court had dismissed Mother's prior appeal regarding T.G. Mother filed an objection to the magistrate's decision, arguing that the evidence supported neither the awards of legal custody nor the finding that CSB had used reasonable reunification

efforts. Mother did not address her motion for a six-month extension of temporary custody in her initial objection. When she supplemented her objection after the filing of the hearing transcript, Mother for the first time argued that the evidence supported the return of the children to her legal custody under the protective supervision of CSB or a six-month extension of the agency's temporary custody.

{¶10} The juvenile court overruled Mother's objection. It noted that Mother's motion for an extension of temporary custody had been dismissed and was not pending before the magistrate at the dispositional hearing. Upon its independent review of the evidence, the juvenile court granted legal custody of T.G. to Grandmother and legal custody of A.J. to Godmother. Mother timely appealed and raises three assignments of error. This Court rearranges some assignments of error to facilitate review.

## II.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN AWARDING LEGAL CUSTODY OF T.G. TO [A THIRD PARTY] FAMILY FRIEND [ ].

{¶11} Mother argues that the juvenile court erred by awarding legal custody of T.G. to a third party. While Mother's assignment of error indicates that T.G. was placed with a family friend, the juvenile court awarded legal custody of this child to Grandmother. Despite Mother's confusion, this Court is nevertheless compelled to vacate the trial court's judgment awarding legal custody of T.G. to any person because the juvenile court acted without jurisdiction when it commenced the dispositional hearing while Mother's appeal regarding the prior, interlocutory disposition of T.G. remained pending before this Court.

{¶12} While a party's appeal to an appellate court is pending, the trial court lacks jurisdiction to act except in aid of the appeal. *In re C.T.*, 2024-Ohio-5083, ¶ 12 (9th Dist.), quoting

*State v. Washington*, 2013-Ohio-4982, ¶ 8, and *State ex rel. Special Prosecutors v. Judges, Court of Common Pleas*, 55 Ohio St.2d 94, 97 (1978). In fact, even if the trial court delays entering its judgment until after a pending appeal has been resolved, it acts without jurisdiction merely by conducting a hearing on a dispositive issue while the appeal is extant. *See In re C.T.* at ¶ 14, 19 (9th Dist.).

{¶13} In the case of T.G., the magistrate conducted the first day of the sunset dispositional hearing while Mother's prior appeal regarding that child was still pending in this Court. Accordingly, the juvenile court acted without jurisdiction with regard to that child's final disposition. The judgment appealed in appellate case number 31128 is, therefore, void and this Court vacates it.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN AWARDING LEGAL CUSTODY OF A.J. TO PATERNAL GRANDMOTHER [ ].

{¶14} Mother argues that the juvenile court erred by awarding legal custody of A.J. to a third party. Again, Mother's assignment of error misidentifies the third party who received legal custody of this child. The juvenile court awarded legal custody of A.J. to Godmother, not Grandmother. Mother's argument of trial court error is not well taken.

> On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest.

(Internal citations and quotations omitted.) *In re M.F.*, 2016-Ohio-2685, ¶ 7 (9th Dist.).

{¶15} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the

credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶16} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 2016-Ohio-1330, ¶ 12 (9th Dist.). The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 2016-Ohio-7994, ¶ 18 (9th Dist.), quoting *In re N.P.*, 2004-Ohio-110, ¶ 23 (9th Dist.). In that regard, the juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 2008-Ohio-5003, ¶ 9 (9th Dist.), citing *In re T.A.*, 2006-Ohio-4468, ¶ 17 (9th Dist.).

{¶17} The best interest factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 2014-Ohio-2748, ¶ 16 (9th Dist.). In addition, the juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 2017-Ohio-1, ¶ 17 (9th Dist.). While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or

neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio.  R.C. 3109.04(F)(1).

{¶18}  A.J. was in Mother's sole legal custody until CSB removed the child when she was 15 years old.  She remained in the agency's temporary custody for 26 months until the juvenile court issued its judgment awarding legal custody to Godmother.  A.J. was in four different placements during the case, residing with Godmother for eight months by the time of the dispositional hearing.

{¶19}  A.J. has a close and comfortable relationship with Godmother.  She is closely bonded with her siblings, particularly T.G.  A.J. assumed a protective, parental-type role with her siblings during visits.  While A.J. and Mother share a strong bond, their relationship has been tumultuous.  A video of Mother hitting A.J. in front of the other three children was a key reason CSB filed the complaints in the children's cases.  Since that time, Mother and A.J. have continued to engage in aggressive and physically violent incidents throughout the case.  In addition, Mother has frequently been belligerent and threatening to the children's various caregivers in front the children.

{¶20}  At 17 years old, after being in custodial limbo for 26 months, A.J. requires permanency in a safe and stable home before she is emancipated.  Despite engaging in a variety of services for two years, Mother remains unable to provide an appropriate home environment for this child.

{¶21}  The main concerns that brought the children into the agency's care were Mother's failure to enroll the children in school after returning to Ohio, her apparent struggle with mental health issues, and Mother's behavior in the video of Mother punching A.J. and pulling the child's hair in front of Mother's other three children.  CSB developed case plan objectives for Mother

relating to mental health services, parenting education, and basic needs. Mother argues that she successfully completed all case plan objectives. The evidence does not support her assertion. Moreover, it is well established that "although case plan compliance may be relevant to the child[ ]'s best interest, it is not determinative." *In re E.W.*, 2024-Ohio-235, ¶ 14 (9th Dist.).

{¶22} Mother waited seven months before obtaining her required psychological assessment at Summit Psychological Associates. The juvenile court qualified the psychological assistant who conducted Mother's assessment as an expert in forensic psychology. He testified that his diagnoses of a parent after assessment enable him "to evaluate how the children can be affected if those issues are not mitigated[.]"

{¶23} The psychological assessor testified that Mother was not completely forthcoming and tended not to take accountability for her actions that put her children at risk. He diagnosed her with personality disorder with borderline and antisocial traits, explaining that borderline traits include problems with interpersonal interactions, impulsivity, and emotional reactivity; while antisocial traits implicate engagement in criminal activities, disregard for the rights of others, and a lack of remorse. He further provisionally diagnosed her with severe cannabis use disorder. He expressed concerns that "[s]ubstance use, legal or not, affects one's judgment. And in the presence of abusive substances, the parent isn't able to make appropriate decisions and make good judgments regarding the care of their child."

{¶24} The assessor testified that he and Mother discussed the physical discipline Mother used with A.J. He testified that Mother claimed the child "had it coming and that it was better that she beat her daughter down than someone from the streets because she was doing it with love."

{¶25} As a result of his assessment, the psychological assistant recommended that Mother engage in individual and group therapy, specifically, dialectical behavioral therapy designed to

help patients change their thinking patterns. He further recommended that Mother have homework assignments to strengthen those cognitive behavioral changes. Moreover, based on concerns regarding Mother's parenting ability, the assessor recommended anger management, substance abuse treatment, and ongoing mental health services.

{¶26} Early on, Mother attended some counseling sessions at Portage Path Behavioral Health but discontinued those because she planned to engage in services at Summit Psychological Associates. She failed to follow up, however, with those ongoing services. The caseworker made a referral for Mother at Ever Well Community Health, where she obtained another diagnostic assessment and began individual counselling two months later. By the time of the hearing, Mother had scheduled five appointments but only attended three. The caseworker testified that she did not know what issues Mother was addressing at Ever Well because Mother disagreed with certain parts of that treatment plan. While Mother disagreed that anxiety played a role in her mental health struggles, Ever Well also informed CSB that Mother claimed that the agency had removed her children based on false allegations of a physical altercation between Mother and A.J. Mother's counselor further reported to CSB that Mother was distracted, unengaged, and resistant to discussing personal information during two recent sessions. The caseworker testified that throughout the case, Mother did not engage in mental health services with any single provider for long enough to have made progress on her mental health objective.

{¶27} Mother testified that, in addition to participating in counseling with two different mental health providers, she completed parenting education and an accredited anger management course she found and paid for herself. She testified that the course "had a tremendous impact on [her] with how to not act . . . not make decisions off emotion and how to control [her] thought process." She added that she now understands how better to communicate with A.J., being

attentive and supportive, and recognizing when to give the child "space" and discuss emotional issues later when she and the child are in a better position to negotiate. Mother's behaviors after completing the anger management course belie her assertions of insight and changed thought processes, however.

{¶28} The caseworker testified that, since she was assigned, Mother attended 20 visits with A.J. and her other children. Of those, 16 visitation logs indicated concerns regarding Mother's behavior during visits. Those concerns included Mother's questioning staff why they were staring at her, although her visits were supervised; ignoring problematic behaviors by the children that required her to address and redirect; and making inappropriate comments to various children, including disparaging remarks and threats of physical harm. In addition, Mother continued to violate CSB's rule that she remain in the visitation center until after the children had left the grounds with their caregivers. Instead, Mother would run out the door and heatedly confront the children's caregivers.

{¶29} After the first day of the dispositional hearing, Mother threatened Godmother while the two of them, A.J., and the caseworker were in a courthouse elevator. The caseworker testified that Mother told Godmother that she had better take care of A.J. or Mother will hurt her (Godmother). Mother admitted saying that but testified that she was joking and that everybody was laughing about her comment. The caseworker testified that no one in the elevator was laughing. The caseworker further testified that Godmother informed her that Mother repeated her threat in the courthouse parking lot.

{¶30} One of the social work assistants who supervised some of Mother's visits testified regarding an incident that occurred after Mother had completed her anger management course. A.J. and Mother got into a heated discussion during a visit. After Mother grabbed A.J.'s phone

from the child, A.J. hit Mother and Mother struck her back. The visitation assistant had to physically separate Mother and A.J., while agency staff called the police. On other occasions, including the evening before the first day of the hearing, the social worker witnessed issues with Mother in the parking lot after visits. For example, Mother ran out to confront A.J.'s caregiver before she could take the child home. On another occasion, Mother interacted inappropriately with the father of one of her other children and made a profane gesture. The caseworker testified that these behaviors by Mother demonstrate poor choices and inappropriate personal interactions, setting bad examples for the children.

{¶31} The caseworker testified that she has seen no difference in Mother's behaviors over time, notwithstanding her participation in services. Mother failed to demonstrate that she had learned how to regulate her emotions, continuing to act impulsively and aggressively in response to behaviors by others she perceived as slights. The caseworker testified that Mother's visitation was never expanded or modified to remove the need for supervision because Mother had not fully embraced mental health services, been necessarily forthcoming with service providers, or demonstrated better skills in interacting with the children and others involved in the case.

{¶32} Of particular concern to the caseworker and guardian ad litem were Mother's inability to refrain from aggressive or threatening behaviors towards others and her lack of accountability for past violence. In addition to the examples noted above, Mother justified the incident involving her physical assault on A.J. by testifying that "I just had to wake her up. I just feel like that was a wake up seriously." When asked whether she has been able to continue to visit with T.R. and M.M. who are in the legal custody of their respective fathers, Mother testified, "Barely, but sometimes I got to kick the door in and get them out of there." After admitting she threatened to "hurt" A.J.'s caregiver in the courthouse elevator but claiming that she was only

joking, Mother admitted she followed up her comment by telling Godmother, "I mean this." In addition, Mother was fired shortly before the second day of hearing for getting into a physical altercation with a coworker.

{¶33} Although Mother testified that she now understands that physical discipline and violence are not appropriate responses and that she has "acknowledged [her] wrongdoings[,]" she explained her various altercations with others by saying, "I was attacked." She blamed her coworker's lack of respect for the fight at work. She blamed "everybody else" involved with her children for the ongoing altercations during the case and asserted that they would stop after she regained legal custody because she planned to "cut [them] off completely." She blamed Grandmother, T.G.'s caregiver, for calling the police after Mother showed up for T.G.'s birthday party the previous month after Grandmother told her not to come because she did not think Grandmother was serious. Finally, Mother could not explain these recent conflicts and acts of physical aggression despite having completed an anger management course.

{¶34} As to the child's wishes, A.J. reported to the caseworker and guardian ad litem that she wants to return to Mother's care. The guardian ad litem opined, however, that placing A.J. in Godmother's legal custody would meet the best interest of the child. A.J. loves Godmother and is happy and comfortable in her home. Godmother provides a safe and stable environment for the child. A.J. receives consistent care there. Godmother ensures that A.J. regularly attends school and her counseling appointments, and that the child's basic needs are met. Godmother facilitates visitation and communication between Mother and the child.

{¶35} The guardian ad litem opined that returning A.J. to Mother's legal custody would not provide either a safe or stable placement for the child because Mother has a lot of work to do in terms of learning to manage conflict and regulate her emotions. She testified that Mother has

not made substantial progress regarding her mental health issues during the past year. Before reunification would be appropriate, the guardian ad litem testified that Mother would have to demonstrate that she can communicate with the children's various caregivers without conflict or police involvement. Despite multiple clinical evaluations, counseling, and anger management services, the guardian ad litem testified that Mother has not changed her behavior to abate the risk to A.J. The caseworker agreed and added that Mother's lack of honesty with providers and reluctance to acknowledge her role in past and ongoing inappropriate incidents makes reunification unlikely within the period of any extension of temporary custody.

{¶36} Based on a thorough review of the record, this is not the exceptional case where the trier of fact clearly lost its way and created a manifest miscarriage of justice by awarding legal custody of A.J. to Godmother. The child was safe, stable, and comfortable in her home. She facilitated opportunities for Mother to visit with A.J. and testified she would continue to do so. Mother, on the other hand, failed to assimilate the lessons and skills she might have learned in her parenting and anger management courses. She failed to gain the necessary insight she might have obtained through consistent and engaged counseling. Instead, Mother continued to make threats of physical harm, engage in acts of violence, and deny accountability for her inappropriate behaviors. Under these circumstances, the juvenile court's finding that an award of legal custody of A.J. to Godmother was in the child's best interest is not against the manifest weight of the evidence. Mother's first assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN DENYING A SIX-MONTH EXTENSION OF [CSB'S] TEMPORARY CUSTODY AS TO BOTH CHILDREN.

{¶37} Mother argues that the juvenile court erred by "denying a six-month extension of temporary custody[.]" This Court disagrees.

**{¶38}** Mother concedes that she had no motion for an extension of temporary custody pending for consideration before the juvenile court. The record indicates that the magistrate "dismiss[ed]" her motion as having been untimely filed. She did not object to the dismissal of her motion and, accordingly, forfeited that challenge on appeal. *In re T.J.*, 2016-Ohio-5394, ¶ 5 (9th Dist.).

**{¶39}** Even were this Court to consider the merits of Mother's argument, we have long held that where legal custody of a child to a third party is in the best interest of that child, an extension of temporary custody necessarily is not. *In re W.W.*, 2024-Ohio-807, ¶ 29 (9th Dist.), citing *In re A.P.*, 2022-Ohio-276, ¶ 9 (9th Dist.), and *In re B.C.*, 2014-Ohio-2748, ¶ 22 (9th Dist.). As we concluded that legal custody of A.J. to Godmother was in the child's best interest, the juvenile court did not err by failing to grant a six-month extension of temporary custody. Mother's third assignment of error is overruled.

### III.

**{¶40}** Mother's first and third assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, granting legal custody of A.J. to Godmother, as appealed in case number 31129, is affirmed. This Court vacates the judgment awarding legal custody of T.G. to Grandmother, as appealed in case number 31128, as having been entered by the juvenile court without jurisdiction.

Judgment affirmed, in part,
and vacated, part.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Mother in case number 31129.

No costs taxed in case number 31128.

_____
BETTY SUTTON
FOR THE COURT


CARR, J.
CONCURS.

FLAGG LANZINGER, J.
CONCURRING IN PART, AND DISSENTING IN PART.

{¶41} I concur with the majority's opinion vacating the judgment appealed in case number 31128 relating to the child T.G.

{¶42} I respectfully dissent regarding case number 31129, as I would dismiss that appeal for lack of a final, appealable order based on the same reasoning enunciated in my various prior dissents. *See, e.g., In re P.O.*, 2024-Ohio-4472, ¶ 32-33 (9th Dist.); *In re T.M.*, 2024-Ohio-2479, ¶ 27-32 (9th Dist.); and *In re O.V.*, 2024-Ohio-2620, ¶ 36-39 (9th Dist.).

{¶43} After overruling Mother's objection to the magistrate's decision, the juvenile court's judgment entry states that "[a]ll prior orders not inconsistent herein shall remain in full force and effect." The judgment did not reiterate the prior orders relevant to the parents' residual rights. Those included in this case the orders referring the matter to the local child support enforcement agency for the determination of child support obligations, and establishing the parameters of Mother's visitation with A.J. Because the judgment requires reference to multiple documents to clarify the parties' rights and obligations, I would conclude that the judgment is not a final, appealable order. *In re P.O.* at ¶ 33 (9th Dist.). Accordingly, I dissent from the majority's opinion in case number 31129.

APPEARANCES:

ANDREW KARAS and JILL CABE, Attorneys at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and AARON B. CAMPBELL, Assistant Prosecuting Attorney, for Appellee.

JASON D. WALLACE, Attorney at Law, for Appellee.

DANIEL R. BACHE, Attorney at Law, for A.J.

JOSEPH KERNAN, Guardian ad Litem.