[Cite as *In re T.M.*, 2024-Ohio-2479.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: T.M.

C.A. No. 30881

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No. DN 22 09 0833

DECISION AND JOURNAL ENTRY

Dated: June 28, 2024

HENSAL, Judge.

{¶1}   Appellant, U.M. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed her minor child in the legal custody of the child's paternal grandparents ("Grandparents").  This Court affirms.

I.

{¶2}   Mother is the biological mother of T.M., born April 24, 2012.  The child's father expressed his agreement with Grandparents receiving legal custody and did not appeal from that judgment.  Although the trial court proceedings also involved a younger sibling of T.M., that child is not a party to this appeal.

{¶3}   Summit County Children Services Board ("CSB") first became involved with the family during June 2022, after receiving reports that Mother was staying with T.M. at a shelter and was continually expressing paranoid and delusional thoughts about herself and the child, including false beliefs that she and the child were being recorded and stalked by people trying to harm them

and that the child had been the victim of repeated sexual assaults and sex trafficking. After CSB first received emergency temporary custody of T.M. during July 2022, it placed the child in a foster home. Two months later, CSB placed T.M. in the home of Grandparents and she remained in their home throughout this case.

{¶4} CSB dismissed its original complaint pertaining to T.M because the case did not proceed to adjudication and disposition in a timely manner. By the time it filed a new complaint on September 23, 2022, T.M. had been in the agency's emergency temporary custody for more than two months. During that period, Mother had a few visits with the child, which were closely supervised by CSB because of concerns about the negative effects of Mother expressing irrational and frightening thoughts to the child. CSB personnel who supervised the visits observed that Mother was sometimes confrontational with T.M., that much of what she said to the child was irrational, and that T.M. often remained quiet and appeared to be confused and uncomfortable around Mother.

{¶5} During a visit on September 13, 2022, a CSB staff person who supervised the visit observed Mother come into the visit angry and heard her repeatedly make statements to the child that did not make sense because they were not based on anything that was happening in the room. Also, for no apparent reason, Mother called T.M. a "liar" and a "traitor" and told T.M. that she was not her mom anymore. T.M. attempted to get Mother to explain what she was talking about, but eventually became so upset about Mother's behavior that she asked to leave the visit. CSB ended the visit after 30 minutes.

{¶6} Consequently, because of concerns that Mother was confusing and frightening T.M. by continually expressing irrational thoughts, the trial court suspended Mother's visits and ordered that she would not be able to resume supervised visitation with T.M. until after the child

completed a trauma assessment and "the child's therapist recommends that it is appropriate for the child to have visitation with [Mother.]"

{¶7} T.M. completed a trauma assessment, during which she explained that she was often afraid of Mother because she would express "weird ideas" and that T.M. would often agree with Mother's delusional thoughts because Mother would punish her if she did not. T.M. detailed several situations during which Mother falsely insisted that T.M. had been sexually abused, that T.M. was calling Mother names, and that T.M. had secretly video recorded Mother's private parts through the lights in the home. T.M. reported that Mother's "paranoid" statements "made [her] want to run away * * * [b]ut [she] had nowhere to go."

{¶8} T.M. explained that when she voiced disagreement about the truthfulness of Mother's statements, Mother would physically punish her until T.M. agreed with Mother's false statements. Consequently, T.M. often "went along" with whatever Mother said just to "get out of situations." T.M. further disclosed that she felt "glad on the inside" when CSB removed her from Mother's custody. T.M.'s trauma assessment included diagnoses of post-traumatic stress disorder and adjustment disorder with mixed disturbance of emotion and conduct. The assessment recommended that the child engage in ongoing trauma therapy, which T.M. began shortly afterward.

{¶9} The juvenile court adjudicated T.M. a dependent child, placed her in the temporary custody of CSB, and adopted the case plan as an order of the court. The case plan goals for Mother focused primarily on her addressing her unstable mental health, but Mother made minimal progress on that reunification goal.

{¶10} Early in the case, Mother appeared for a psychological evaluation, but the professional who was scheduled to evaluate her opined that Mother should not complete the testing

that day because she was expressing irrational thoughts, and her testing results would not be valid. He believed that Mother might have been experiencing auditory hallucinations because she insisted that others in the lobby were calling her names, but no one else was present in the lobby.

{¶11} Mother was evaluated by a psychiatrist, who diagnosed her with paranoid personality disorder. The psychiatrist recommended that Mother take prescribed psychiatric medication to control her delusional and paranoid thoughts, but Mother was not willing to take medication. She insisted that she had no problems and did not need medication. Mother engaged in counseling with a psychiatrist, but the psychiatrist opined that Mother made minimal progress toward stabilizing her mental health because she needed psychiatric medication. Consequently, Mother continued to express angry and delusional thoughts and exhibit irrational behavior throughout this case.

{¶12} T.M. continued to reside with Grandparents and adjusted well to living there. On March 3, 2023, CSB moved for T.M. to be placed in the legal custody of Grandparents. At the final dispositional hearing, Father expressed his agreement with Grandparents receiving legal custody and Mother alternatively requested that the trial court continue T.M. in CSB's temporary custody so she could have more time to work on the reunification goals of the case plan.

{¶13} Following the final dispositional hearing, the magistrate decided that T.M. should be placed in the legal custody of Grandparents. Mother filed timely objections to the magistrate's decision, which were later overruled by the trial court. The trial court placed T.M. in the legal custody of Grandparents. Mother appeals and raises two assignments of error, which this Court will address together because they are closely related.

II.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED TO MOTHER'S PREJUDICE IN GRANTING LEGAL CUSTODY TO THIRD PARTIES WHEN THE COURT DID NOT PROPERLY CONSIDER THE  STATUTORY FACTORS IN [SECTION] 2151.414(D) RELEVANT TO THE BEST INTERESTS FINDINGS REQUIRED FOR REMOVAL FROM MOTHER AND PLACEMENT OF THE CHILD WITH THIRD PARTIES.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED TO MOTHER'S PREJUDICE IN GRANTING LEGAL CUSTODY TO THIRD PARTIES WHEN THE DECISION WAS NOT SUPPORTED SUFFICIENTLY BY COMPETENT, CREDIBLE EVIDENCE GOING TO ALL OF THE ESSENTIAL ELEMENTS OF THE CASE.

{¶14}  Through her two assignments of error, Mother asserts that the trial court did not fully consider the statutory best interest factors and that its legal custody decision was not supported by the evidence presented at the hearing.  On appeal, Mother does not articulate an argument about why legal custody to Grandparents was not in the child's best interest, nor does she propose an alternative disposition for the child.  Instead, she asserts that the trial court did not have enough evidence before it to make an informed decision about the child's best interest.  This Court's review of the record reveals otherwise.

{¶15}  An award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence.

> Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value.  In other words, when the best interest of a child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest. Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

(Internal citations and quotations omitted.) *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

**{¶16}** In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

**{¶17}** "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. Despite Mother's argument to the contrary, no specific test or set of criteria is set forth by statute regarding an award of legal custody. Ohio courts agree, however, that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23.

**{¶18}** The juvenile court is guided by the best interest factors enumerated in Revised Code Section 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, and the child's need for permanence. R.C. 2151.414(D)(1)(a)-(d); *see also In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 16. Section 2151.414(D)(1)(e) also requires the trial court to consider whether any of the factors set forth in Sections 2151.414(E)(7)-(11) apply to this case, but those factors are not relevant here.

**{¶19}** The juvenile court may also apply the best interest factors in Section 3109.04(F)(1). *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850 and 15CA010860, 2017-Ohio-1, ¶ 17. While many factors overlap with those set forth in Section 2151.414(D)(1), separate factors that are relevant in this case are the child's adjustment to their "home, school, and community[]" and the proposed custodian's likelihood to honor and facilitate visitation or parenting time. R.C. 3109.04(F)(1)(d),(f).

**{¶20}** At the final dispositional hearing, Mother did not dispute that she was not prepared to provide T.M. with a stable home. She had not verified to CSB or the guardian ad litem that she had stable housing or income and, more importantly, she had not stabilized her mental health. The trial court emphasized that Mother's testimony at the hearing "was difficult to follow" as it was not responsive to the questions she was asked and was "not rooted in reality." Moreover, although Mother acknowledged that T.M. needed trauma counseling, she continued to express her belief that something or someone else had traumatized her child. Mother failed to acknowledge any responsibility for her child's custodial situation in this case or the breakdown in their mother-daughter relationship.

**{¶21}** On the other hand, the evidence about T.M.'s relationship with Grandparents was entirely positive. Several witnesses testified that T.M. was comfortable and had adjusted well to living in Grandparents' home. Grandparents were meeting her needs and providing her with a safe and stable home. During her trauma assessment, T.M. described living in Grandparents' home as "[g]reat" and "[a]wesome!" She described her close relationship with them and explained that she had been living with Grandparents "[s]ince I was born." Although the specific times frames are not explained in the record, T.M. had lived with Grandparents off and on throughout her life and maintained a close bond with them.

{¶22} The evidence before the trial court was not disputed that Grandparents had demonstrated a willingness and ability to provide T.M. with a stable home throughout the child's life. T.M. and her parents lived with Grandparents when T.M. was first born because her parents had nowhere else to live. Grandparents have always maintained a bedroom for T.M. in their home and T.M. has lived with them for several months or years at a time, sometimes with Mother and/or Father and sometimes without either parent. During a five to six-month period during 2021 and 2022, Mother left T.M. with Grandparents and told them that she was leaving the country. Grandmother did not know whether Mother left the country or where she was during that extended period.

{¶23} T.M.'s wishes were expressed by the guardian ad litem. T.M., who was 11 years old at the time of the hearing, told him that she wanted to be placed in the legal custody of Grandparents. The guardian ad litem reiterated the concerns of other witnesses that T.M. had experienced a lot of trauma and instability in her relationship with Mother and needed time to overcome her past trauma and to try to rebuild a relationship with Mother through counseling. He agreed with the child's expressed wishes that placement in the legal custody of Grandparents was in the best interest of T.M.

{¶24} Finally, the trial court considered whether Grandparents would be likely to facilitate visitation between Mother and T.M. Grandmother and Grandfather testified that they understood that Mother would retain residual parental rights. Grandfather testified that he does not have a good relationship with Mother, but that he would not withhold visits between Mother and T.M. Grandmother testified that she would be willing to facilitate visits between Mother and T.M. but that, until Mother stabilized her mental health, she believed that the visits should be supervised.

CSB, the guardian ad litem, and the trial court agreed that Mother's visits with T.M. should be supervised as long as her mental health remains unstable.

{¶25} Given the evidence presented at the final dispositional hearing, Mother has failed to demonstrate that the trial court lost its way in determining that legal custody to Grandparents was in the best interest of T.M. *See Eastley* at ¶ 20. Mother's assignments of error are overruled.

## III.

{¶26} Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

                                        _____

JENNIFER HENSAL
FOR THE COURT

CARR, P. J.
<u>CONCURS.</u>

FLAGG LANZINGER, J.
<u>DISSENTING.</u>

{¶27} I respectfully dissent from the majority opinion because I would dismiss this appeal for lack of a final, appealable order.

{¶28} Juv.R. 40(D)(4)(a) provides that a "magistrate's decision is not effective unless adopted by the court." A juvenile court can enter judgement on the magistrate's decision before the time for filing objections has expired. Juv.R. 40(D)(4)(e)(i). When that occurs, the timely filing of objections "shall operate as an automatic stay of execution of the judgment until the court disposes of those objections and vacates, modifies, or adheres to the judgment previously entered." *Id*. When ruling on objections, the juvenile court "shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law." Juv.R. 40(D)(4)(d).

{¶29} "In order for a judgment to be final and appealable, a trial court cannot merely adopt a magistrate's decision; it must enter its own judgment that sets forth 'the outcome of the dispute and the remedy provided.'" *Miller v. McStay*, 9th Dist. Summit No. 22918, 2006-Ohio-2282, ¶ 4, quoting *Harkai v. Scherba Industries, Inc.*, 136 Ohio App.3d 211, 218 (9th Dist. 2000); *see In re G.G.*, 9th Dist. Summit No. 29952, 2022-Ohio-1654, ¶ 9 (acknowledging that caselaw involving

Civ.R. 53(D) may be used when analyzing Juv.R. 40(D)). The trial court must do so in a manner "such that the parties need not resort to any other document to ascertain the extent to which their rights and obligations have been determined." *Miller* at ¶ 4, quoting *Reiter v. Reiter*, 3d Dist. Hancock No. 5-98-32, 1999 WL 378354, * 2 (May 11, 1999); *Conrad v. Conrad*, 9th Dist. Summit No. 21394, 2003-Ohio-2712, ¶ 4, quoting *In re Zakov*, 107 Ohio App.3d 716, 717 (11th Dist.1995) ("The trial court 'must sufficiently address [the] issues so that the parties may know of their rights and obligations by referring only to that document known as the judgment entry.'"). "Where 'the trial court's filing improperly requires the parties to refer to and compare two separate documents to understand their rights and obligations,' the order is not final and appealable." *In re P.L.H.*, 2d Dist. Greene No. 2020CA0019, 2020-Ohio-7029, ¶ 7, quoting *Keeney v. Keeney*, 2d Dist. Clark No. 19-CA-0037, 2019-Ohio-4098, ¶ 5

{¶30} Here, the magistrate issued a decision that granted legal custody of T.M. to her paternal grandparents. The magistrate's decision also addressed Mother and Father's residual parenting rights. The juvenile court adopted the magistrate's decision on the same day. Mother then filed timely objections.

{¶31} The juvenile court's judgment entry overruling Mother's objections to the magistrate's decision does not dispose of all of the matters at issue between the parties "such that the parties need not resort to any other document to ascertain the extent to which their rights and obligations have been determined." *Miller* at ¶ 4. The juvenile court's judgment entry does not mention Father, let alone set forth his residual parenting rights. Nor does it set forth Mother's visitations rights. To ascertain those rights, the parties would need to resort to the juvenile court's prior judgment entry that adopted the magistrate's decision. While the juvenile court's judgment entry states that "[a]ll prior orders not inconsistent herein shall remain in full force and effect[,]" I

would conclude that a judgment entry that requires the parties to "refer to and compare two separate documents to understand their rights and obligations" is not a final, appealable order. *In re P.L.H.* at ¶ 7.

{¶32} Because the juvenile court's judgment entry does not dispose of all of the matters at issue between the parties, I would dismiss this appeal for lack of a final, appealable order. *See Miller* at ¶ 4. Accordingly, I respectfully dissent.

APPEARANCES:

ALEXANDRA HULL, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.