[Cite as *In re P.O.*, 2024-Ohio-4472.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: P.O.

C.A. No.     31005

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 22 08 0750

DECISION AND JOURNAL ENTRY

Dated: September 11, 2024

---

SUTTON, Presiding Judge.

{¶1}     Appellant Mother appeals the judgment of the Summit Count Court of Common Pleas, Juvenile Division, that placed her child in the legal custody of a paternal cousin ("Cousin"). This Court affirms.

I.

{¶2}     Mother and Father are the biological parents of P.O., born February 22, 2019. Father ceased attending hearings early in the case and has not appealed the juvenile court's judgment.

{¶3}     Mother and Father were both romantically involved in a relationship with another woman, J.S. On one occasion when P.O. was three years old, J.S. was preparing to drive Mother, Father, and the child to visit someone in the hospital. As J.S. sat behind the wheel of the running van, Mother and Father began physically assaulting her, leading J.S. to drive away to escape. As J.S. accelerated, P.O. fell out of the van and J.S. unknowingly ran over the child. As a result, P.O.

suffered severe injuries including neck, arm, and skull fractures; traumatic brain injury ("TBI"); brain swelling; hematomas; injury to a lung; seizures; and a suspected stroke. The child's skull fracture impacted her pituitary gland, leading to diabetes insipidus which caused dehydration and the consistent need to monitor fluid input and output. Her TBI necessitated around-the-clock supervision to ensure that the active child did not suffer additional injuries, particularly due to falls or impact to her head. The hospital initiated physical, occupational, and speech therapies as part of the child's treatment plan.

{¶4} Summit County Children Services Board ("CSB" or "the agency") investigated after receiving a referral alleging that Mother and Father were removing the child from the hospital instead of taking her for therapy and failing to adhere to the treatment schedule posted in P.O.'s hospital room. The child missed therapy sessions and medication doses due to the parents' interference. Upon further investigation, CSB learned that Father had been diagnosed with schizophrenia, bipolar disorder, anxiety, and depression and was not in treatment or taking his prescribed medications. The agency further discovered that Mother and Father have a history of domestic violence, and that P.O. has witnessed incidents of intimate partner violence between her parents and their paramour, including the day the child was run over by the van J.S. was driving. Mother also had an active warrant relating to a charge of disorderly conduct arising out of a domestic situation with Father. Based on these concerns, CSB obtained an emergency order of temporary custody and filed a complaint alleging that P.O. was an abused, neglected, and dependent child.

{¶5} Mother and Father appeared and waived their rights to both the adjudicatory and dispositional hearings. They stipulated that P.O. was a dependent child. CSB dismissed its allegations of abuse and neglect. The parents further stipulated to the child's placement in the

temporary custody of CSB, the adoption of the agency's case plan as an order, and that CSB had used reasonable efforts to prevent the child's continued removal from home. The case plan required the parents to obtain parenting assessments and follow all recommendations, demonstrate the ability to meet the child's basic needs, and attend the child's medical appointments and demonstrate an understanding of and the ability to meet the child's special/medical needs.

{¶6} It took Mother nearly six months to complete her parenting assessment which identified additional concerns related to mental health, substance abuse, and parenting skills. Although Mother was already required to follow all recommendations arising out of the parenting evaluation, CSB formally amended the case plan to add mental health counseling with a practitioner specializing in dialectical behavioral therapy, outpatient substance abuse treatment, ongoing case management, and individual parenting education.

{¶7} The magistrate maintained the child in the agency's temporary custody after three review hearings as the parents had only minimally complied with case plan requirements. Thereafter, CSB filed a motion for legal custody to Cousin, with whom the agency had placed the child upon her release from the hospital.

{¶8} As a preliminary matter at the sunset dispositional hearing, Mother's attorney orally moved for a six-month extension of temporary custody. After the hearing, the magistrate issued a decision granting the agency's motion and placing P.O. in Cousin's legal custody. Mother timely filed an objection. The juvenile court overruled Mother's objection and granted CSB's motion for legal custody to Cousin. Mother filed a timely appeal, raising one assignment of error for review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT ERRED TO THE PREJUDICE OF [MOTHER] WHEN IT
GRANTED THE LEGAL CUSTODY OF THE MINOR CHILD TO [COUSIN]

WHEN IT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE
THAT THIS PLACEMENT WAS IN THE BEST INTEREST OF THE CHILD[ ].

{¶9}    Mother argues that the juvenile court's award of legal custody to Cousin is against the manifest weight of the evidence.  She additionally argues that the evidence supports granting her a six-month extension of temporary custody to allow her to continue to work toward reunification.  This Court disagrees.

> On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence.  Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value.  In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest.

(Internal citations and quotations omitted.)  *In re M.F.*, 2016-Ohio-2685, ¶ 7 (9th Dist.).

{¶10}   In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered."  (Internal citations and quotations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.  When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact."  *Id.* at ¶ 21.

{¶11}   "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 2016-Ohio-1330, ¶ 12 (9th Dist.).  The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 2016-Ohio-7994, ¶ 18 (9th Dist.), quoting *In re N.P.*, 2004-Ohio-

110, ¶ 23 (9th Dist.). In that regard, the juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 2008-Ohio-5003, ¶ 9 (9th Dist.), citing *In re T.A.*, 2006-Ohio-4468, ¶ 17 (9th Dist.).

{¶12} The best interest factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 2014-Ohio-2748, ¶ 16 (9th Dist.). In addition, the juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 2017-Ohio-1, ¶ 17 (9th Dist.). While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶13} As Mother was unmarried when she gave birth to P.O., she was the child's sole legal custodian before CSB removed the child at three and a half years old. *See* R.C. 3109.042(A). Father did not establish paternity until nine months into the case. The parents' relationship has been on and off, and it is unclear how much involvement Father had with the child prior to the agency's involvement. CSB placed P.O. with Cousin with whom the child had resided for a year at the time of the sunset dispositional hearing.

{¶14} Early in the case, Cousin allowed Mother and Father unlimited visitation in her home, but the parents failed to take consistent advantage of those opportunities. Thereafter, Cousin set specific times for visits on Mondays, Wednesdays, and Fridays; but the parents again rarely

utilized those times. After Mother got into a verbal disagreement with Cousin during a visit, her visits were moved to CSB's visitation center.

{¶15} At first, Mother and Father slept during visits and did not interact much with the child. The parents' interactions with P.O. improved, particularly as they enjoyed separate visits. At the time of the hearing, Mother was interacting appropriately with the child, although Mother regularly missed one quarter of her visits.

{¶16} Mother and Father had separate visitation times in large part due to their volatile relationship. They have a history of domestic violence with each other, as well as with their paramour. Law enforcement intervened on more than one occasion during the case because of physical altercations between the parents. The police determined that Mother was the aggressor in an incident when Mother hit Father in the face with a pole. At the time of the hearing, Mother still had an outstanding warrant on a 2021 disorderly conduct charge. Despite the physically aggressive history of the parents' relationship and Mother's claim that she and Father were no longer together, Mother testified that she was pregnant at the time of the hearing with Father's child and admitted that he maintains contact with her.

{¶17} The guardian ad litem testified that the child shares a bond with both Mother and Father. She characterized P.O.'s relationship with Cousin as "positive and good." The guardian ad litem testified that the child is very comfortable in Cousin's home, where all her basic and special needs are met. P.O. enjoys spending time with Cousin's adult children and minor grandchildren who visit often.

{¶18} P.O. is a medically fragile child who will need consistent, ongoing care. She is engaged in speech therapy, mental health counseling, and recurring endocrinology and neurology appointments. Recent vision issues require her to wear an eye patch for three hours each day. Last

year, she attended an integrated preschool where she received all necessary therapies, socialization, and educational services. The child deserves a permanent home where all those needs can be met. Cousin has been proactive in facilitating the child's education and ensuring her participation in services.

{¶19} Since the beginning of the case, P.O. has had more than 40 medical and therapeutic appointments. Mother attended only two appointments in the year before the hearing. The caseworker and guardian ad litem testified that they informed Mother of upcoming appointments early on and ensured that she had access to the child's MyChart account to keep track of appointments. The caseworker testified that she emphasized to Mother that it was Mother's responsibility to stay apprised of the child's appointments. Because Mother lacked transportation, CSB provided her with bus passes. Nevertheless, Mother failed to attend most appointments where she would have had the opportunity to participate and ask questions about the child's needs and required care. The caseworker testified that Mother demonstrated no understanding of P.O.'s medical or other issues, insisting that the child was "fine" despite the extensive involvement of medical and service providers.

{¶20} Mother also had limited engagement in services to address her own issues. It took her more than five months to complete her parenting assessment because she failed to appear for scheduled appointments. After the assessor recommended mental health services and a substance abuse assessment, the caseworker made the necessary referrals. Mother never obtained mental health treatment to address her diagnoses of depression and other specified personality disorder with borderline traits. She failed to schedule a drug use assessment, even after testing positive for marijuana without possessing a medical marijuana card.

{¶21} The caseworker also referred Mother to Ever Well for case management services and parenting education. Mother spoke with a case manager one time during the five months since CSB made a referral. She only recently began in-home parenting education.

{¶22} Mother additionally made minimal progress regarding her basic needs case plan objective. She was sporadically employed part-time. At the time of the hearing, she reported having recently obtained a job at a restaurant after having left her prior job at a different restaurant. Mother testified that she worked from 4:00 p.m. to midnight three days a week. She did not explain what her childcare plans for P.O. would be when she was working.

{¶23} Early in the case, Mother had independent, subsidized housing for which she was required to pay $25 per month for rent. After she fell a couple hundred dollars behind in rent payments, the housing authority evicted her. Mother moved in with her mother, the child's maternal grandmother ("Grandmother"). Grandmother is blind and requires dialysis. Mother must spend time taking care of Grandmother. Multiple other relatives live in Grandmother's home. The caseworker was concerned about the large number of other people in the home whom she had been unable to assess because Mother had not returned her calls regarding the other occupants' availability.

{¶24} As P.O. was four years old at the time of the hearing, she was not mature enough to express her wishes for custody, so the guardian ad litem spoke on her behalf. The guardian ad litem opined that an award of legal custody to Cousin was in the child's best interest. She reasoned that P.O. required permanency in an environment where all her basic and special needs would be met. The guardian ad litem testified that Mother lacks insight into her own mental health issues and how domestic violence impacts the child. She opined that the child would not be safe in Mother's home due to the parents' on again/off again relationship and history of physical

altercations, as well as the overwhelming odor of marijuana in the home that compelled her to leave a home visit less than a month before the hearing.

{¶25} The guardian ad litem agreed with the caseworker's belief that Mother would not make substantial case plan progress in an additional six months given Mother's lack of insight and progress to date. The caseworker testified that Mother made no significant progress on any case plan objectives. Mother admitted that she had not obtained a substance abuse assessment or engaged in mental health counseling, that she had missed visits, and that she had not resolved her outstanding warrant from 2021. She asserted that she would handle the warrant "next month." She explained, "I have to do one thing at a time because they're rushing me to do everything right then and there." She reasoned that she does things slowly because "I don't want to overwhelm myself." After an outburst by an unidentified observer in court that Mother would have family support, Mother testified that she would rely on family support in caring for P.O.

{¶26} Based on a thorough review of the record, this is not the exceptional case where the trier of fact clearly lost its way and created a manifest miscarriage of justice by awarding legal custody to Cousin. Mother had not developed any insight into the child's medical and therapeutic needs or her own mental health, substance abuse, and parenting issues. She made minimal progress on the case plan objectives designed to address those concerns. On the other hand, Cousin had provided a safe and stable home for P.O. for a year, meeting the child's basic, special, and educational needs. Cousin had facilitated the parents' visitation and testified that she would continue to do so. The child is very bonded with Cousin and comfortable in her home. Under these circumstances, the juvenile court's finding that an award of legal custody to Cousin was in the child's best interest is not against the manifest weight of the evidence.

{¶27} To the extent that Mother argues that the juvenile court erred by failing to grant her motion for a six-month extension of temporary custody, this Court disagrees. As stated above, the juvenile court must resolve a motion for legal custody solely in consideration of the best interest of the child. *In re K.H.*, 2016-Ohio-1330, at ¶ 12. It is well settled that "'[w]here the trial court finds that it is in the best interest of the child to be placed in legal custody as a permanent disposition, the trial court must necessarily deny any extension of temporary custody.'" *In re B.C.*, 2014-Ohio-2748, at ¶ 22, quoting *In re C.M.*, 2009-Ohio-943, ¶ 24 (9th Dist.). *See also In re A.P.*, 2022-Ohio-276, ¶9 (9th Dist.) ("[I]f legal custody to a nonparent is in the best interest of the child, an extension of temporary custody is not.").

{¶28} In addition, the juvenile court would have had authority to grant a first six-month extension of temporary custody only if it also found, by clear and convincing evidence, that "there has been significant progress on the case plan of the child, and there is reasonable cause to believe that the child will be reunified with one of the parents . . . within the period of extension." R.C. 2151.415(D)(1). As explained above, Mother failed to make significant progress on her case plan objectives.

{¶29} Moreover, there was not reasonable cause to believe that P.O. could have been reunified with Mother within the period of extension. Mother had not begun to engage in services related to mental health and substance abuse. She had only one conversation with her case manager at Ever Well. She attended only two of the child's more than 40 medical and therapeutic appointments, minimizing her lack of attendance because she understood the child's issues in her "own way." Mother lacked insight into the impact of domestic violence on the child and maintained a relationship with Father which produced both additional involvement by law enforcement and another pregnancy. Mother herself testified that she was not capable of

addressing her various issues or engaging in multiple services quickly because it overwhelmed her. She had not yet managed to consistently attend visits with the child. Under these circumstances, Mother failed to present clear and convincing evidence that reunification was reasonably likely to occur withing another six months.

{¶30} For the above reasons, this Court concludes that the juvenile court did not err by denying Mother's oral motion for a six-month extension of temporary custody and granting CSB's motion for legal custody to Cousin. Accordingly, Mother's assignment of error is overruled.

III.

{¶31} Mother's sole assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

---

BETTY SUTTON
FOR THE COURT

HENSAL, J.
CONCURS.

FLAGG LANZINGER, J.
DISSENTING.

{¶32} I respectfully dissent from the majority opinion because I would dismiss this appeal for lack of a final, appealable order based on the same reasoning enunciated in my dissents in *In re T.M.*, 2024-Ohio-2479, ¶ 27-32 (9th Dist.), and *In re O.V.*, 2024-Ohio-2620, ¶ 36-39 (9th Dist.).

{¶33} After overruling Mother's objection to the magistrate's decision, the juvenile court's judgment entry states that "[a]ll prior orders not inconsistent herein shall remain in full force and effect." The judgment did not reiterate the prior orders relevant to the parents' residual rights. Those included in this case the orders establishing paternity and a father-child relationship, referring the matter to the local child support enforcement agency to set and enforce child support obligations, assigning the responsibility to provide health insurance for the child and the right to claim P.O. for tax purposes, and establishing the parameters of the parents' visitation with the child. Because the judgment requires reference to multiple documents to clarify the parties' rights and obligations, I would conclude that the judgment is not a final, appealable order. *See In re P.L.H.*, 2020-Ohio-7029, ¶ 7 (2d Dist.). Accordingly, I dissent.

APPEARANCES:

ALAN M. MEDVICK, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.