[Cite as *In re L.W.*, 2024-Ohio-4660.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

IN RE: L.W.

C.A. No.     31040

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 22 06 570

DECISION AND JOURNAL ENTRY

Dated: September 25, 2024

---

STEVENSON, Presiding Judge.

{¶1}    Appellant, T.W. ("Father"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed his minor child in the legal custody of a paternal great-aunt ("Aunt") and great-uncle ("Uncle").  This Court affirms.

I.

{¶2}    Father is the biological father of L.W., born June 22, 2020.  The child's mother ("Mother") did not appeal from the trial court's judgment, but she filed a brief to support Father's assignments of error.  *See In re E.S.*, 2018-Ohio-3929, ¶ 2 (9th Dist.).  Father and Mother are not married but have lived together as a couple since before this case began.  They had purchased a trailer in Kent, Ohio, but were living in the Summit County home of the maternal grandmother while they renovated the trailer.

{¶3}    Summit County Children Services Board ("CSB") first became involved with this family after it received a referral about extensive drug activity in the home in which Father and

Mother were then living with L.W. and that L.W. often lacked adequate supervision. On June 16, 2022, the sheriff's department removed L.W. from that home pursuant to Juv.R. 6. At that time, Father agreed to an oral drug test and tested positive for amphetamine, methamphetamine, and THC. Mother appeared to be under the influence of some substance, but she refused to submit to a drug test.

{¶4} The next day, CSB filed a complaint to allege that L.W. was an abused, neglected, and dependent child. In addition to concerns about the parents' drug use, CSB was concerned about their untreated mental health problems. Father had been diagnosed with post-traumatic stress disorder ("PTSD"); Mother had been diagnosed with bipolar disorder, obsessive compulsive disorder, and attention deficit hyperactivity disorder; and neither parent was involved in mental health treatment. Mother also had been diagnosed with epilepsy but was not then taking any medication, and continued to suffer from frequent seizures, which prevented her from being able to care for a young child.

{¶5} Both parents later waived their rights to a contested adjudicatory hearing and agreed to the child being adjudicated dependent as alleged in the complaint. They also waived their rights to a dispositional hearing and explicitly agreed that: (1) L.W. would be placed in the temporary custody of CSB, (2) CSB had made reasonable efforts to prevent the continued removal of L.W. from the home, and (3) that the case plan would be adopted as an order of the court.

{¶6} The case plan required the parents to obtain mental health and substance abuse assessments and engage in any recommended treatment, sign information releases, and demonstrate that they could meet the basic needs of L.W. in a safe and stable home. For the next several months, Mother and Father did not work with CSB toward reunification. Both parents eventually obtained substance abuse and mental health assessments. Mother engaged in some

counseling but refused to engage in the intensive outpatient treatment that had been recommended by her assessment.

{¶7} Father downplayed his substance abuse and mental health problems, refused to sign information releases so that CSB could monitor his case plan progress, and was argumentative and uncooperative with CSB throughout this case. The caseworker was able to learn, however, that Father briefly engaged in some counseling but was terminated from the agency because of his lack of attendance. She did not know whether Father had reengaged in mental health services with another agency. The caseworker believed that Father's untreated PTSD was the biggest obstacle to reunification because he exhibited anger and distrust of everyone who attempted to work with him.

{¶8} L.W. was initially placed in a foster home, but the foster family later asked CSB to remove him from their home because "[h]e cried constantly" and they were unable to console him. The parents did not identify any local friends or relatives as a potential kinship placement for the child, as they have few stable friends or family living in this area. Instead, they recommended Aunt and Uncle, who live in Southeastern Ohio, where both parents have other extended family members. Aunt had served as a stable parent figure to Father when he was young. L.W. was placed in the home of Aunt and Uncle, who met all the child's needs in a stable family environment throughout this case.

{¶9} CSB later moved for L.W. to be placed in the legal custody of Aunt and Uncle. The parents alternatively requested a six-month extension of temporary custody. Following an evidentiary hearing, the magistrate decided to place L.W. in the legal custody of Aunt and Uncle. Mother and Father filed objections to the magistrate's decision, which were later overruled by the

trial court.  The trial court placed L.W. in the legal custody of Aunt and Uncle.  Father appeals and raises three assignments of error.

## II.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT GRANTED LEGAL CUSTODY OF THE MINOR CHILD TO [AUNT AND UNCLE] AS [CSB] FAILED TO DEMONSTRATE WITH CLEAR AND CONVINCING EVIDENCE THAT IT WAS IN THE CHILD[]'S BEST INTEREST.  THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

### ASSIGNMENT OF ERROR II

THE [TRIAL COURT] COMMITTED REVERSIBLE ERROR AND ABUSED [ITS] DISCRETION WHEN IT DENIED FATHER'S MOTION FOR A SIX-MONTH EXTENSION.

{¶10}  This Court will address Father's first two assignments of error together because they are closely related.  Father challenges the evidence supporting the trial court's decision to place L.W. in the legal custody of Aunt and Uncle.  Father does not argue that the trial court should have returned the child to his legal custody, as he essentially conceded that he was not prepared at the time of the hearing to provide L.W. with a stable permanent home.  Instead, he asserts that the trial court should have granted his alternative request for a six-month extension of temporary custody to allow him more time to work on the case plan.  To facilitate analysis, this Court will first address his challenge to the denial of his request for an extension of temporary custody and then review the evidence supporting the trial court's decision to place L.W. in the legal custody of Aunt and Uncle.

**Extension of Temporary Custody**

{¶11}  Father is correct that the trial court was required to consider the best interest of the child when it ruled on the two competing dispositional requests in the case: (1) grant legal custody

to Aunt and Uncle, or (2) grant an extension of temporary custody to CSB. *See In re K.H.*, 2016-Ohio-1330, ¶ 12 (9th Dist.); R.C. 2151.415(D)(1). Although the trial court's decision to extend temporary custody required it to consider the best interest of the child, the court had authority to grant a first six-month extension of temporary custody only if it also found, "by clear and convincing evidence" that "there has been significant progress on the case plan" and "there is reasonable cause to believe that the child will be reunified with one of the parents . . . within the period of extension." R.C. 2151.415(D)(1).

{¶12} The trial court explicitly denied Father's request for an extension of temporary custody because it found the record failed to demonstrate that either parent had made "significant progress" on the case plan. That finding is supported by the record. As explained above, Father did not sign releases of information, so CSB was unable to verify whether he was receiving treatment, or making progress in treatment, for his mental health and substance abuse problems. The caseworker testified that she remained concerned about Father's frequent angry outbursts and his unwillingness to trust people who were trying to help him.

{¶13} Furthermore, although Mother did not appeal, she and Father continued to live together, so her case plan progress was also relevant to this determination. Mother was more cooperative than Father and CSB had been able to verify that she was involved in ongoing counseling, but Mother had refused to participate in intensive outpatient treatment, which had been recommended by her mental health and substance abuse assessment. It is also troubling to this Court that, although Mother wanted more time to work on the case plan and was present at the hearing, she did not testify or present any evidence on her own behalf.

{¶14} Moreover, the parents did not demonstrate that they had made progress toward meeting the basic needs of L.W. They had limited income, as each was unemployed and their

sources of income came from Mother's disability income, Father's odd jobs, and by both selling plasma two times a week. They did not provide CSB or the trial court with full details about their expenses or overall financial situation, however, so it is unclear whether they were even meeting even their own financial needs.

{¶15} They also lived in a trailer that CSB had determined was uninhabitable. Initially, the trailer had a serious water leak, no stove or appliances, no heat or running water, and it was in a filthy and deplorable condition. Father had continued to make improvements to the trailer, but the caseworker had been unable to observe its most recent condition. Father testified that he had made more improvements, but he admitted that the trailer still had no heat.

{¶16} CSB was also concerned that the parents did not consistently visit L.W. and did not maintain contact with Aunt and Uncle to inquire about him. The parents were offered visits with the child every two weeks, but they missed approximately half of them. Transportation was a problem for them, but they did not ask for further assistance or use the assistance that was provided to them. Moreover, the physical distance between the two homes did not prevent phone calls to Aunt or Uncle to inquire about the child, but they never called to ask about L.W.

{¶17} Given the lack of clear and convincing evidence that either parent had made "significant progress" on the case plan, the trial court lacked authority under R.C. 2151.415(D)(1) to grant a first six-month extension of temporary custody. Consequently, it did not err in denying the parents' requests on that basis.

## Legal Custody to Aunt and Uncle

{¶18} Next, this Court reviews whether the trial court's decision to place L.W. in the legal custody of Aunt and Uncle was in the child's best interest. Although Father asserts that the legal custody judgment was not supported by clear and convincing evidence, that is not the appropriate

burden of proof required to support a legal custody judgment. Instead, an award of legal custody must be supported by the lesser standard of a preponderance of the evidence. *In re M.F.*, 2016-Ohio-2685, ¶ 7 (9th Dist.). "Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value." (Internal quotations omitted.) *Id.*

{¶19} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶20} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 2016-Ohio-1330, at ¶ 12. No specific test or set of criteria is set forth by statute regarding an award of legal custody, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 2016-Ohio-7994, ¶ 18 (9th Dist.), quoting *In re N.P.*, 2004-Ohio-110, ¶ 23 (9th Dist.).

{¶21} The juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 2008-Ohio-5003, ¶ 9 (9th Dist.), citing *In re T.A.*, 2006-Ohio-4468, ¶ 17 (9th Dist.). Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors of R.C. 2151.414(E)(7)-(11) apply to this case.

R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 2014-Ohio-2748, ¶ 16 (9th Dist.). None of the factors set forth in R.C. 2151.414(E)((7)-(11) apply to the facts of this case.

{¶22} The juvenile court may also consider the best interest factors in R.C. 3109.04(F)(1). *In re K.A.*, 2017-Ohio-1, ¶ 17 (9th Dist.). While many factors overlap with those set forth in R.C. 2151.414(D)(1), separate factors that are relevant in this case are the child's adjustment to "home, school, and community[]" and the proposed custodian's likelihood to honor and facilitate visitation or parenting time. R.C. 3109.04(F)(1)(d),(f).

{¶23} Father's interaction with L.W. during this case was limited to supervised visits because he had failed to demonstrate any compliance with the mental health and substance abuse components of the case plan. Father apparently got along well with Aunt and Uncle, as Aunt had served as a parent figure to him for many years. The circumstances of that relationship are not explained in detail in the record, except that Father testified that he had a "tragic childhood" because he "lost" his mother and Aunt stepped in as his caretaker and was "the best mom I ever had since then[.]"

{¶24} For reasons not clear from the record, Father took advantage of only about half of his scheduled visits. Transportation was apparently a problem, but Father did not reach out to CSB for much assistance aside from one gas card, as he maintained little contact with the caseworker. Father also had not asked Aunt or Uncle to help with transportation, nor had he reached out to Aunt and Uncle to inquire about the wellbeing or progress of L.W. while in their care.

{¶25} The child's interaction with Aunt and Uncle and adjustment to their home had been entirely positive. The evidence was undisputed that the child had adjusted well to living in their home, which the guardian ad litem described as a loving and nurturing home. L.W. had other relatives in the area and had frequent contact with them. Father conceded at the hearing that Aunt

is a suitable caretaker for his child, as he testified that "[y]ou couldn't ask for a better mom[]" than Aunt.

{¶26} Both the caseworker and the guardian ad litem marveled at the progress L.W. had made in the home of Aunt and Uncle. At the time L.W. was placed in their home, he was two years old, but was unable to speak, and suffered from other apparent developmental delays and emotional problems. Aunt and Uncle were proactive in getting L.W. the early intervention services that he needed to address his emotional and developmental needs. They reinforced the child's therapy in the home, met all his other basic needs, and L.W. flourished in their home. L.W. had learned to speak and was continuing speech therapy, was reaching his other developmental milestones, and had become a "happy and vibrant" young child. The caseworker observed that L.W. had made remarkable progress while in the care of Aunt and Uncle. Based on her 16 years' experience as a caseworker, she testified that it was "very telling" to observe such a "night and day" transformation of a child in out-of-home care.

{¶27} Because L.W. was not yet three years old, he was too young to express his wishes about where he wanted to live. The guardian ad litem opined that legal custody to Aunt and Uncle was in the child's best interest because he was thriving in their home. She emphasized that Aunt and Uncle got along well with Mother and Father and a lot of extended family members living near them, who had also become involved in L.W.'s life. She recognized that the distance between the parents and the potential custodians was not ideal but emphasized that they were the only kinship placement identified by the parents. She further observed that, "in a perfect world," the parents would relocate to Southeastern Ohio, to be closer to their child and other extended family.

{¶28} Father does not dispute that L.W. needed a legally secure permanent placement or that he and Mother were not prepared to provide him with a suitable home at the time of the

hearing. Because the record does not demonstrate the statutory requirements for an extension of temporary custody under R.C. 2151.415(D)(1), the trial court reasonably concluded that a legally secure permanent placement would be achieved by placing L.W. in the legal custody of Aunt and Uncle.

{¶29} Finally, the evidence demonstrated that Aunt and Uncle had a good relationship with Father and Mother, had been facilitating visitation throughout this case, and were willing to continue doing so. Aunt testified that she and Uncle had brought L.W. to this area once to see his parents, but that usually the parents came to her. Aunt was asked whether she would be willing to meet the parents at a half-way location due to the distance between her home and the parents' home. She responded that she had never been asked to meet the parents halfway, but that she would be willing to do that, if the parents would provide assurances that they would show up for the planned visit.

{¶30} Father has failed to demonstrate that the trial court lost its way by placing L.W. in the legal custody of Aunt and Uncle. Father's first and second assignments of error are overruled.

## ASSIGNMENT OF ERROR III

THE [TRIAL COURT] COMMITTED A REVERSIBLE ERROR AND ABUSED ITS DISCRETION WHEN IT GRANTED LEGAL CUSTODY TO [AUNT AND UNCLE] WHEN THE AGENCY DID NOT PROVIDE REASONABLE REUNIFICATION EFFORTS.

{¶31} Finally, Father asserts that the trial court erred in placing L.W. in the legal custody of Aunt and Uncle because CSB did not make reasonable efforts to reunite him with L.W. At certain hearings during which a juvenile court removes a child from the home or continues the removal of the child from the home, R.C. 2151.419(A) requires the trial court to make findings that the agency made "reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for

the child to return safely home." Those hearings include the legal custody hearing at issue in this case "because it [was] a hearing conducted pursuant to R.C. 2151.353(A)(3) "'at which the court removes a child from the child's home or continues the removal of a child from the child's home[.]'" *In re Z.K.*, 2023-Ohio-2150, ¶ 30 (9th Dist.), quoting R.C. 2151.419(A).

**{¶32}** The record reveals that CSB referred Father to service providers, arranged for him to have visitation with his child, and attempted to maintain regular contact with Father, but that Father was unwilling to work with the agency on the case plan requirements. On appeal, Father asserts that CSB's reunification efforts were deficient because: (1) CSB failed to conduct a more recent inspection of the parents' trailer, and (2) CSB placed L.W. with Aunt and Uncle who lived too far away for Father to regularly visit the child. This Court will address each argument in turn.

**{¶33}** Father asserts that the caseworker refused to conduct a recent inspection of his home because he has dogs. That is not an accurate reflection of the evidence in the record, however. The record reveals that the caseworker inspected the parents' living situation by walking through their trailer during March 2023, two months before the hearing. When she returned to inspect the trailer one month later, however, the caseworker told Father that she would not go into the trailer until he restrained his dogs, who were loose inside the trailer. Father refused to restrain the dogs and became further angered after the caseworker again asked Father to sign information releases so she could speak with his service providers, if he was engaged in services. A heated altercation ensued, and the caseworker left before Father's anger escalated further. The caseworker did not return before the hearing because the parents did not cooperate with her to schedule any further visits to the home. Consequently, Father's inability to demonstrate the latest renovations to the trailer was a result of his own lack of cooperation with the caseworker, not any lack of reunification efforts by the agency. *See In re D.L.*, 2024-Ohio-809, ¶ 28 (9th Dist.).

{¶34}  Next, Father asserts that CSB impeded his ability to reunify with L.W. because the agency placed him with Aunt and Uncle, who live in Southeastern Ohio, as it was too far away for Father to regularly visit the child.  According to the testimony of Aunt, at the beginning of this case, the drive between her home and Father's home took approximately three and one-half hours.  During this case, however, Aunt and Uncle moved to a different home, which located them closer to this area.  According to Aunt, it is now a three-hour drive between her home and the parents' home.

{¶35}  Father ignores the significance of CSB's statutory obligation to pursue a kinship placement for L.W.  Because L.W. was placed in in the temporary custody of the agency, R.C. 2151.4116(A) explicitly required CSB to "make intensive efforts to identify and engage an appropriate and willing kinship caregiver for the child[.]"  CSB was unable to locate any relatives or appropriate close family friends who lived in Northeastern Ohio.  *See* R.C. 2151.4115(A)(1) (adopting the definition of "kinship caregiver" in R.C. 5101.85, which includes family and close non-relative friends).

{¶36}  In fact, it was Father, who has a long-standing, close relationship to Aunt and Uncle, and other relatives in Southeastern Ohio, who recommended Aunt and Uncle to CSB as kinship caregivers.  At that time, Father was aware of the location of Aunt and Uncle's home.  There is nothing in the record to demonstrate that Father ever complained about the distance between his home and the kinship placement or asked for L.W. to be relocated.  The distance between the two homes also had been considered in making a visitation schedule, as the agency offered the parents financial assistance with transportation to and from visits; CSB offered longer visits twice a month, rather than shorter, weekly visits; and Aunt had expressed a willingness to help with transportation.  Given all these circumstances, Father has not demonstrated that the

agency's placement of the child with relatives in Southeastern Ohio demonstrated a lack of reasonable reunification efforts.  Father's third assignment of error is overruled.

## III.

{¶37}  Father's assignments of error are overruled.  The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

SCOT STEVENSON
FOR THE COURT

CARR, J.
CONCURS.

FLAGG LANZINGER, J.
DISSENTING.

**{¶38}** I respectfully dissent from the majority opinion because I would dismiss this appeal for lack of a final, appealable order based on the same reasoning enunciated in my dissents in *In re T.M.*, 2024-Ohio-2479, ¶ 27-32 (9th Dist.); *In re O.V.*, 2024-Ohio-2620, ¶ 36-39 (9th Dist.); and *In re P.O.*, 2024-Ohio-4472, ¶ 32-33 (9th Dist.).

**{¶39}** After overruling both parents' objections to the magistrate's decision, the juvenile court's judgment entry states that "[a]ll prior orders not inconsistent herein shall remain in full force and effect." The judgment did not reiterate the prior orders relevant to the parents' residual rights in this case. Those orders included establishing the parameters of the parents' visitation with the child; allowing the parents access to information about the child's schooling, daycare, extracurricular activities, and medical, dental, and counseling treatment; and requiring all parties to keep each other informed with up-to-date addresses and phone numbers. "Because the judgment requires reference to multiple documents to clarify the parties' rights and obligations, I would conclude that the judgment is not a final, appealable order." *In re P.O.*, 2024-Ohio-4472, at ¶ 33 (9th Dist.), citing *In re P.L.H.*, 2020-Ohio-7029, ¶ 7 (2d Dist.). Accordingly, I dissent.

APPEARANCES:

STEPHEN M. GRACHANIN, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

ALEXANDRA HULL, Attorney at Law, for Appellee.